## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | | |
|---|---|---|---|
| (1) | **ALLISON BEARD,** | ) | Case No. CIV-19-310-HE |
| (2) | **ADRIAN E. GRANT** | ) | |
| (3) | **BRANDON J. BALLARD,** | ) | |
| (4) | **CARIE R. WALKER,** | ) | |
| (5) | **CHEYENNE A. MOORE,** | ) | |
| (6) | **DAVID FLOWERS,** | ) | |
| (7) | **DELMA L. SULLIVAN,** | ) | |
| (8) | **DEODRICK CARTER,** | ) | |
| (9) | **DONNIE A. MCINTOSH,** | ) | |
| (10) | **DONNINO Y. MORELAND,** | ) | |
| (11) | **KEITH L. BROWN,** | ) | |
| (12) | **LARRY D. BROWN,** | ) | |
| (13) | **RICO WILLIAMS** | ) | |
| (14) | **ROBIN RATLIFF,** | ) | |
| (15) | **SHAWN A. DETWILER,** | ) | |
| (16) | **SHAWN E SHINTON,** | ) | |
| (17) | **TERRY L. HUNT,** | ) | |
| (18) | **TERRY L. LEE,** | ) | |
| (19) | **TITUS T. HELMS,** | ) | |
| (20) | **TRAVIS HUDDLESTON,** | ) | |
| (21) | **TONY D. HUMDY,** | ) | |
| (22) | **TYRONE MORROW,** | ) | |
| (23) | **WAYNE WILLIAMS,** | ) | |
| | **on behalf of themselves and a class** | ) | |
| | **of similarly situated individuals** | ) | |
| | **Plaintiffs,** | ) | |
| | | ) | |
| **v.** | | ) | |
| | | ) | |
| (1) | **DELYNN FUDGE, Executive Director,** | ) | |
| | **Oklahoma Pardon and Parole Board** | ) | |
| | **and in her individual capacity,** | ) | |
| | | ) | |
| (2) | **JOE ALLBAUGH, Director,** | ) | |
| | **Oklahoma Department of Corrections,** | ) | |
| | **and in his individual capacity,** | ) | |
| | **Defendants.** | ) | |

1

## CIVIL COMPLAINT

COMES NOW, the Plaintiffs, through their attorney, Ronald "Skip" Kelly, and submits the Plaintiffs' "Complaint" and states:

## PARTIES

**PLAINFIFFS** (All Plaintiffs are residents of the State of Oklahoma).

1.    **Plaintiff:**    Allison Beard, # 104519, Oklahoma County, Case No. CF-1979-4516, an inmate in the custody of the Oklahoma Department of Corrections was convicted in 1979 of:

Count 1: Murder I                                                   LIFE

2.    **Plaintiff:**    Adrian E. Grant, # 250714, Oklahoma County, Case No. CF-1996-2619, an inmate in the custody of the Oklahoma Department of Corrections was convicted in 1996 of:

Count 1: Manslaughter I                                             LIFE

3.    **Plaintiff:**    Brandon J. Ballard, # 281777, Tulsa County, Case No. CF-1999-277, an inmate in the custody of the Oklahoma Department of Corrections was convicted in 1999 of:

Count 1: Murder I    (felony)                        LIFE (CS)
Count. 2: Shooting with Intent to Kill              LIFE (CS)
(An appeal is pending in the OCCA, PC-2018-1225).

4.    **Plaintiff:**    Carie R. Walker, # 249486, Oklahoma County, Case No. CF-1994-1739, an inmate in the custody of the Oklahoma Department of Corrections was convicted in 1994 of:

Count 1: Murder I                                                   LIFE

5.    **Plaintiff:**    Cheyenne A. Moore, # 175584, Cleveland County, Case No. CRF-1988-887, an inmate in the custody of the Oklahoma Department of Corrections was convicted of:

Count 1: Murder I                                                   LIFE

2

6.     **Plaintiff:**     David Flowers, # 231086, Comanche County, CF-1993-241, an inmate in the custody of the Oklahoma Department of Corrections was convicted in 1992 of:

| | |
|---|---|
| Count 3-4: Murder I | (2) LIFE (CS) |
| Count 5: Conspiracy to Commit Robbery-First Degree | 10 years (CS W/Ct. 3). |

(An appeal is pending in the OCCA, PC-2019-212.)

7.     **Plaintiff:**     Delma L. Sullivan, # 224367, Oklahoma County, Case No(s). CF-1993-2996, CF-1993-5403, CF-1993-5404, CF-1993-5406, an inmate in the custody of the Oklahoma Department of Corrections and was sentenced in 1995 of:

CF-1993-2996

| | |
|---|---|
| Count 1: Murder I | LIFE |
| Count 2: Robbery with a Dangerous Weapon | 50 years |
| Count 3: Robbery with a Dangerous Weapon | 50 years |

(All counts CS and CS to CF-1993-5406)

CF-1993-5403

| | |
|---|---|
| Count 1: Unauthorized Use of a Motor Vehicle | 4 years |

CF-1993-5404
Count 1: Grand Larceny 5 years (Discharged October 5, 1996)

CF-1993-5406

| | |
|---|---|
| Count 1: Defrauding an Inn Keeper | 5 years. |

8.     **Plaintiff:**     Deodrick Carter, # 230093, Oklahoma County Case, No.CF-1993-5406, CF-1993-2996, an inmate in the custody of the Oklahoma Department of Corrections and was sentenced in 1997 of:

CF-1993-2996

| | |
|---|---|
| Count 1: Murder I | LIFE (CS) |
| Count 2: Robbery with A Firearm | 15 years (CS) |
| Count 3: Robbery with A Firearm | 15 years (CS) |
| CF-1993-5406 | |
| Count 1: Arson III | 15 years |

(CS to CF-1993-2996)

9.    **Plaintiff:**    Donnie A. McIntosh, # 259416, Oklahoma County, Case No. CF-1996-2308, CF-1997-6886, CF-1997-6887, CF-1997-6892, an inmate in the custody of the Oklahoma Department of Corrections and was sentenced in 1997 of:

CF-1996-2308
Count 4: Robbery with a Firearm                        LIFE
(CS but CC to CF-1997-6887)
CF-1997-6886
Count 1: Burglary II                                   7 years (CS)

CF-1997-6887
Count 1: Burglary II                                   7 years (CS)

CF-1997-6892
Count 1: Burglary I                                    20 years
(discharged September 1, 2011).

10.    **Plaintiff:**    Keith L. Brown, # 374584, Logan County, Case No. CF-1999-174, an inmate in the custody of the Oklahoma Department of Corrections was sentenced in 1999 of:

Count 1: Shooting with Intent to Kill                  LIFE
(An appeal is pending in the OCCA, PC-2018-724)

11.    **Plaintiff:**    Larry D. Brown, # 260964, Tulsa County, Case No. CF-1997-1409, an inmate in the custody of the Oklahoma Department of Corrections was sentenced in 2018, after resentencing, of:

Count 1: Murder I                                      LIFE
(A direct appeal is pending in the OCCA, F-2018-954)

12.    **Plaintiff:**    Robin Ratliff, # 342233, Rogers County, Case No.CRF-1994-73, an inmate in the custody of the Oklahoma Department of Corrections was sentenced in 1994 of:

Count 1: Murder II                                     LIFE

13.    **Plaintiff:**    Shawn A. Detwiler, # 225353, Garfield County, Case No. CF-1996-244, CF-1996-422, CF-1996-423, CF-1996-482, serving de facto LWOP, is an inmate in the custody of the Oklahoma Department of Corrections was sentenced in 1998 of:

CF-1996-422
Count 1: Robbery with an Imitation Firearm                          46 Years (CS)

CF-1996-423
Count 1: Robbery or Attempted w/Dangerous Weapon        87 Years (CS)
Count 2: Assault &/or Battery w/Deadly Weapon                  LIFE  (CS)

CF-1996-244         (discharged Sept. 23, 2001)
Count 1: Burglary in the Second Degree,                          5 Years
Count 2: Knowingly Concealing Stolen Property               5 Years
Count 3: Unauthorized Use of a Motor Vehicle                 5 Years
Count 4: Unauthorized Use of a Motor Vehicle                 5 Years

CF-1996-482         (discharged Oct. 14, 2006)
Count 1: Assault &/or Battery w/Dangerous Weapon          10 Years
Count 2: Escape from Confinement         (discharged)        3 Years

(An appeal is pending in the OCCA, PC-2018-723)

14.    **Plaintiff:**    Shawn E. Shinton, # 225353, Garvin County, Case No. CF-1993-20 an inmate in the custody of the Oklahoma Department of Corrections and was sentenced in 1994 of:

Count 1: Murder II                                                      LIFE

15.    **Plaintiff:**    Terry L. Hunt, Tulsa County, Case No. CF-1996-5169, an inmate in the custody of the Oklahoma Department of Corrections and was sentenced in 1997 of:

Count 1: Murder I                                                       LIFE

16.    **Plaintiff:**    Terry L. Lee, Oklahoma County, Case No. CF-1992-573, serving de facto LWOP, is an inmate in the custody of the Oklahoma Department of Corrections and was sentenced in 1997 of:

Count 1: Robbery with a Firearm                             25 Years (CS)
Count 2: Murder I                                                      LIFE (CS)

17.    **Plaintiff:**    Titus T. Helms, Carter County, Case No. CF-1994-106, an inmate in the custody of the Oklahoma Department of Corrections and was sentenced in 1995 of:

Count 1: Murder I                                                LIFE

(Plaintiff has an Application for Post-Conviction Relief pending in the District Court)

18.   **Plaintiff:**   Tony D. Humdy, Carter County, Case No. CRF-1992-281, an inmate in the custody of the Oklahoma Department of Corrections and was resentenced in 2018 of:

Count 1: Attempted Robbery with a Firearm          LIFE (CC)
Count 3: Murder I                                              LIFE (CC)

(Plaintiff was resentenced on December 21, 2018, and an appeal is pending in the OCCA, F-2018-1278.)

19.   **Plaintiff:**   Tyrone Morrow, # 271328 Tulsa County, Case No. CF-1998-746, serving de facto LWOP, is an inmate in the custody of the Oklahoma Department of Corrections and was sentenced in 1999 of:

Count 1: Murder I                                              LIFE (CS)
Count 2: Murder I                                              LIFE (CS)
Count 3: A and B w/deadly Weapon                    20 Years (CS)

20.   **Plaintiff:**   Wayne Williams, # 263411, Oklahoma County, Case No. CF-1996-495, an inmate in the custody of the Oklahoma Department of Corrections and was sentenced in 1997 of:

Count 1: Murder I                                              LWOP (CS)
Count 2: Murder I                                              LWOP (CS)

(Plaintiff has an application for post-conviction relief pending in the district court.)

**DEFENDANT**

1.     **Defendant**:   DELYNN FUDGE, Executive Director, Oklahoma Pardon and Parole Board ("PPB") and in her individual capacity was working under color of State law when the allegations arose. *West v. Atkins*, 487 U.S. 42 (1988). The Defendant is a resident of the State of Oklahoma.

2.     **Defendant:** JOE ALLBAUGH, Director, Oklahoma Department of Corrections, and in his individual capacity was working under color of State law when the allegations arose. *West v. Atkins*, 487 U.S. 42 (1988). The Defendant is a resident of the State of Oklahoma.

## JURISDICTION AND VENUE

1.     The cause of this action is brought under 42 U.S.C. § 1983 with this Court having jurisdiction under 42 U.S.C. § 1331 and 28 U.S.C. §§ 1343. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over state law claims asserted. Also, under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

2.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions causing Plaintiff's claims occurred in this District.

## INTRODUCTORY STATEMENT AND FACTUAL BASIS FOR CLAIM

3.     In 2012, the United States Supreme Court declared such sentences unconstitutional for those under 18 at the time of their crimes, noting "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller v. Alabama*, 132 S.Ct. 2455, 2458, 2469 (2012) (citing *Roper v. Simmons*, 543 U.S. 551, 560 (2005), and *Graham v. Florida*, 560 U.S. 48, 68-69 (2010)).

4.     The Plaintiffs were juveniles at the time the offenses were committed and sentenced to terms of Natural Life where these sentences guarantee death behind bars for crimes allegedly committed as children and, decades later, are being deprived of a meaningful opportunity for release, in contravention of their federal constitutional rights.

5.     Plaintiffs have submitted statistical data compiled from the PPB at [Exhibit 1]. This data establishes Plaintiffs' burden demonstrating there is no realistic opportunity to obtain release before the expiration of a sentence. The fiscal year 2017, the PPB considered 900 total violent offenders and recommended only 23 offenders or 2.5% to the Governor for final approval. The fiscal year 2018 yielded slightly higher but far from a realistic opportunity, the PPB considered 1,020 total violent offenders and recommended only 64 offenders or 6.3% to the Governor for final approval. This data cannot be disputed by the State which demonstrates with certainty the PPB only provides a minuscule of hope at obtaining release and not any meaningful or realistic opportunity to obtain release within Plaintiffs' life expectancy.

6.     A juvenile offender sentenced to a natural life which exceeds his life expectancy does not support the position of rehabilitation. A life sentence equals de facto LWOP which violates the Eighth and Fourteenth Amendments. The Plaintiffs' sentences exceed their life expectancy thus violating the Eighth Amendment. Where "the bar in the U.S. Constitution's Eighth Amendment against cruel and unusual punishment prohibits subjecting an individual "to excessive sanctions." *Roper v. Simmons*, 543 U.S. 551, 560 (2005).

7.      Plaintiffs are entitled to a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham v. Florida,* 560 U.S. 48, 75 (2010) (emphasis added). Juvenile offenders sentenced to *de facto* life without parole now have a constitutionally-protected liberty interest in parole proceedings permitting release based on demonstrated maturity and rehabilitation. The Defendant Board's practices and customs governing the parole review process for Plaintiffs represent arbitrary system of denials which do not comply with *Graham* and *Miller's* mandates. For review, Defendants treat these "juvenile offenders" no differently than adult offenders.

8.      The Defendant Board violates Plaintiffs' constitutional rights to a meaningful and realistic opportunity to obtain parole. Absent intervention by this Court, the PPB will continue to violate the rights of the juvenile offenders whose rehabilitation and maturation is not being meaningfully considered. There is no legislation in place that would mandate the Board consider any factors as out lined in *Graham* or *Miller* thus leaving a system solely discretionary

9.      The discretionary parole procedures in Oklahoma provide no evidentiary rules, no right to obtain expert assistance or testimony, no cross-examination, no compulsory process, or the assistance of counsel and cannot meet the meaningful requirements under the constitution and enforce *Miller's* concerns. In Oklahoma for a homicide offender or any offense considered violent, the parole process is done in two-stages. The first stage is a jacket review where the majority of offenders are denied. After a review of the statistical data compiled by the Board their denials appear based upon

commitment offenses because no requirements must be considered. In the first stage "jacket review" the offender has no right to challenge the accuracy of any information obtained in the Board's file.

10.     The hearings in second stage are rarely granted but when they are, they generally less than 15 minutes, with the majority of the discussion not on the individual's rehabilitation and maturation but on the underlying commitment offense, which occurred decades prior. Any inquiry which ignores maturity and rehabilitation is inadequate and focuses upon the commitment offense is inadequate to provide meaningful consideration and depriving those offenders to a realistic opportunity. Also, Plaintiffs may not challenge accuracy of any portion of the parole information obtained in their file.

11.     A liberty interest has been established in a parole system for these juvenile offenders thus dissolving the State's sovereign immunity under the Eleventh Amendment. The PPB and Governor are now subject to a cause of action that the class of offenders have standing to bring. A liberty interest has been established by the Constitution under the Eighth Amendment where an expectation and interest created by state laws or policies. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *Estate of DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334, 1339 (10th Cir. 2007).

12.     Because of Defendant Board's actions, Plaintiffs have been and continue to be denied a realistic and meaningful opportunity for release, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and in violation of the Okla. Constitution, Art. I, §§ 7, 9.

13.     The goal is not to challenge the fact or duration of Plaintiffs' confinement. Instead, Plaintiffs seek a declaration that the current parole process afforded to individuals serving de facto LWOP sentences are unconstitutional, and an affirmative injunction requiring Defendant Board to provide proceedings that afford a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation for youthful offenders serving unconstitutional de facto LWOP sentences.

14.     Plaintiffs' claims are two-fold, seeking declaratory judgement because the Oklahoma Legislature revived and reenacted by reference Oklahoma's Truth and Sentencing Act ("Act") and sentencing matrix. Plaintiffs argue because the created liberty interest in parole creates a federal constitutional claim thus giving the Court supplemental jurisdiction over any state law claims. See Below.

I.      **PLAINTIFFS' SENTENCES VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE THE OKLAHOMA PARDON AND PAROLE BOARD'S SYSTEM IS INADEQUATE TO PROVIDE A MEANINGFUL AND REALISTIC OPPORTUNITY FOR RELEASE BASED ON DEMONSTRATED MATURITY AND REHABILITATION.**

### ARGUMENT AND AUTHORITY

16.     The requirements of due process under *Graham*, *Miller*, and *Montgomery* require a meaningful and realistic opportunity to obtain release. The PPB's review in Oklahoma is discretionary and cannot provide for any meaningful or realistic opportunity for consideration for parole within an individual's life expectancy. The issues with

rehabilitation and maturation are issues that get no consideration by the PPB because the system is solely discretionary. Plaintiffs' arguments about a lack of meaningful and realistic opportunity from a process that is more sham, than real. When a juvenile offender has no reasonable expectation to ever be released from confinement then a sentence that exceeds their life expectancy violates the Eighth Amendment's prohibition against cruel and unusual punishment and subjecting an individual "to excessive sanctions." *Roper v. Simmons*, 543 U.S. 551, 560 (2005). The Supreme Court's opinions in juvenile law displays the "evolving ***standards of decency*** that mark the progress of a maturing society," *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

17.     Plaintiffs argue any sentence exceeding their life expectancy is a de facto LWOP and *Miller* still applies to those sentenced to a Life term. A Federal Court in Maryland addressed a case that dealt with a life sentence with the possibility of parole it found that a life sentence still violated the Eighth Amendment because of an arbitrary parole system. See *Foster v. Dovey*, TDC-15-3979 (D. Md. Apr. 27, 2018). *Foster* is analogous to the Class's claims regarding the adequacy of the parole system with the court stating in Foster:

> At first glance, *Miller* appears inapplicable to Foster's claims because although Foster was a juvenile at the time of the commission of the crime for which he was convicted, he received a sentence of *life imprisonment*, not life imprisonment without the possibility of parole. Foster, however, asserts that his sentence "in essence was transform(ed] without due process of law into a life sentence without the possibility of parole," Suppl. Pet. at 4, ECF No. 4, through a policy of former Maryland Governor Parris N. Glendening that an individual serving a life sentence would not be granted parole absent very limited circumstances, a policy referred to as "life means life." *Id.* In Foster's

case, the Maryland Court of Special Appeals held, in affirming the denial of Foster's motion to alter or amend the judgment, that because a governor always retains discretion in granting or denying parole, Foster continues to serve a sentence of life imprisonment with the possibility of parole. *Foster v. Kupec*, No. 1841, at 6-7 (Md. Ct Spec. App. June 20, 2001) (citing *Lomax v. Warden*, 741 A.2d 476,480-81 (Md. 1999)).

That decision was entered prior to the Supreme Court's rulings in *Miller* and *Montgomery*. Since then, courts have been confronted with the question whether Maryland's parole system provides meaningful review to juveniles with life sentences, sometimes referred to as "juvenile lifers," such as Foster. Currently pending in this District is a case, in which Foster is a named plaintiff, that challenges the constitutionality of Maryland's parole system as applied to juvenile lifers whose sentences ostensibly provide the possibility of parole. *Maryland Restorative Justice Initiative v. Hogan*, No. ELH-16-1021, 2017 WL 467731 (D. Md. Feb. 3, 2017). In denying a motion to dismiss, the court held that the plaintiffs had "sufficiently alleged that Maryland's parole system operates a system of executive clemency, in which opportunities for release are 'remote,' rather than a true parole scheme in which opportunities for release are 'meaningful' and 'realistic,' as required by" *Graham v. Florida*, 560 U.S. 48, 75 (2010) (forbidding sentences of life without parole for juveniles committing non-homicide crimes). *Maryland Restorative Justice Initiative*, 2017 WL 467731 at \*27.

18.     Plaintiffs argue that in Oklahoma, the Governor retains sole discretion in a grant of clemency, only after favorable recommendation by the PPB. This is a material fact indistinguishable from Foster. Another indistinguishable fact is that a term of life has been repeatedly addressed by the Tenth Circuit. In an unpublished opinion, *Jackson v. McCollum*, Case No. 17-6137, (10th Cir. Jan. 18, 2018), the Court found "at all relevant points in time, a life sentence in Oklahoma meant a term of imprisonment for the remainder of the convicted individual's natural life." See also *Parker v. Allbaugh*, No. 18-CV-0232-JED-FHM (N.D. Okla. Oct. 22, 2018) (same); *Young v. Allbaugh*, No. CIV 18-028-JHP-KEW (E.D. Okla. Oct. 23, 2018) (same); *Foster v. Allbaugh*, No. CIV 17-051-JHP-KEW

(E.D. Okla. Aug. 28, 2018) (same). A natural life term or equivalent exceeds the life expectancy of the juvenile offender removing any realistic opportunity to obtain release based upon an inadequate discretionary parole system violates the Eighth Amendment.

19.     Stare decisis controls the definition of life sentences. In *Hawkins v. State*, 2002 OK CR 12, ¶ 46, 46 P.3d 139, 148, ("meaning of life without parole is self-explanatory" and that an instruction on its meaning is not required). *Powell v. State*, 2000 OK CR 5, 995 P.2d 510, 536, *cert. denied*, 531 U.S. 935 (2000) (same); *Howell v. State*, 1998 OK CR 53, 967 P.2d 1221, 1224-25, *cert. denied*, 528 U.S. 834 (1999) (same); *McCracken v. State*, 1994 OK CR 68, 887 P.2d 323, 334, *cert. denied*, 516 U.S. 859 (1995) (same). In *Hawkin*s at ¶ 47, *supra*, the OCCA found: "A life sentence means imprisonment for the balance of the defendant's natural life with the possibility of being considered for parole…. A life without parole sentence means imprisonment for the balance of the defendant's natural life without the possibility of ever being considered for parole. (quoting *Johnson v. State*, 1996 OK CR 36, 928 P.2d 309, 320). With the Court's definition of a natural life sentence, the sentences exceed Plaintiffs life expectancy equivalent to de facto LWOP.

20.     The Court's reasoning in *Graham* applies to de facto LWOP sentences with the same force as it does to *de jure* ones. Like de jure LWOP, de facto LWOP is entirely incompatible with *Graham's* mandate those juvenile offenders capable of reform be afforded a meaningful opportunity for release. In *Moore v. Biter*, 725 F.3d 1184, 1194 (9th Cir. 2013) the Court found that "[De facto LWOP] is irreconcilable with *Graham's*

14

mandate that a juvenile nonhomicide offender must be provided 'some meaningful opportunity' to reenter society." (quoting *Graham* at 75); see also *Miller* at 473 ("Life without parole . . . [is] at odds with a child's capacity for change.").

21.    Other state courts have made determinations regarding fixed term sentences where the Court found in *Casiano v. Comm'r of Corr.*, 317 Conn. 52, 115 A.3d 1031, (2015) ("a ***fifty year*** term and its grim prospects for any future outside of prison effectively provide a juvenile offender with '***no chance for fulfillment outside prison walls***, no chance for reconciliation with society, ***no hope***'" (quoting *Graham*, 560 U.S. at 79)), *Bear Cloud v. State*, 334 P.3d 132, 136, 141-42 (Wyo. 2014) (holding that a sentence that would keep the defendant in prison ***until age sixty-one*** was the *functional equivalent of a life sentence*), and *State v. Null*, 836 N.W.2d 41, 72 (Iowa 2013) (holding that "*Miller's* principles are fully applicable to a lengthy term-of-years sentence"). (emphasis added). A lengthy term of year sentence can also be a natural life sentence. In *Parker v. Allbaugh*, No. 18-CV-0232-JED-FHM[1] (N.D. Okla. Oct. 22, 2018) the Court faced an argument that dealt with a 199-year sentence which found Parker's argument assuming without deciding that his sentence was the equivalent of Life. The Tenth Circuit denied a COA to Parker.

### A.    FLORIDA SUPREME COURT:
### *Lee v. State*, 234 So. 3d 562 (Fla. 2018).

25.    The Florida Supreme Court in *Lee v. State*, found Lee was originally sentenced to life imprisonment on April 20, 2001. Because of the Florida Statutes, the trial

---

[1] The Court shall take judicial notice under Fed. R. Evid. 201.

court classified the offense as a life felony and sentenced Lee to life without parole. After *Graham*, *supra*, Lee moved to correct his illegal sentence, which the trial court granted. At the conclusion of resentencing in 2011, a successor trial judge sentenced Lee to *40 years imprisonment with a **twenty-five-year minimum mandatory** sentence*. Forty years is consistent throughout the United States in sentencing a juvenile offender and should further add supportive weight to Plaintiffs request for declaratory judgment. While those offenders subject to the 85% rule in Oklahoma must be entitled to receive credits. A flat sentence of 40 years without earned credits would exceed the juvenile offender's life expectancy and not provide a meaningful opportunity for release.

### B.    THE SEVENTH CIRCUIT:
   *McKinley v. Butler*, **809 F.3d 908 (7th Cir. 2016)**

26.    In *McKinley v. Butler*, Judge Posner applied the logic of *Miller* to vacate a 100-year sentence imposed on a non-incorrigible juvenile offender, reasoning that the District Court "did not consider the Supreme Court's 'children are different' statement in *Miller*," and that:

> [I]t is such a long term of years (especially given the unavailability of early release) as to be— unless there is a radical increase, at present unforeseeable, in longevity within the next 100 years—a de facto life sentence, and **so the logic of *Miller* applies**. . . .

> [T]he "children are different" passage . . . from *Miller v. Alabama* cannot logically be limited to de jure life sentences, as distinct from sentences denominated in numbers of years yet highly likely to result in imprisonment for life. *Id.* at 911.

27.    The fact that the "children are different" passage from *Miller* cannot be

limited solely to de jure LWOP and because the PPB's policy is not adequate to comply with the realistic opportunity for release. The Plaintiffs due process claims against the Defendant Board demonstrate their policies violate the Fourteenth Amendment for failing to meet the mandates of *Graham* and *Miller*.

### C.   THE NINTH CIRCUIT:
*Moore v. Biter*, 725 F.3d 1184 (9th Cir. 2013)

28.   In *Moore v. Biter*, at 1194 , reversed and remanded the action to the District Court with instruction to grant the Writ. The California Court of Appeals unreasonably concluded that *Graham* did not apply to a 254-year sentence for multiple crimes because it was a term-of-years sentence. *Id.* at 1187. The Ninth Circuit held that the state court's failure to apply *Graham* was "contrary to . . . clearly established Federal law," *Id.* at 1186 (quoting 28 U.S.C. § 2254(d)(1)), because (1) "*Graham's* focus was not on the label of a 'life sentence,'" *Id.* at 1192; (2) both LWOP and de facto LWOP "deny the juvenile the chance to return to society," *Id.*; and (3) the sentence "is irreconcilable with *Graham's* mandate that a juvenile nonhomicide offender must be provided 'some meaningful opportunity' to reenter society," *Id.* at 1194.

29.   Plaintiffs have demonstrated there is not any meaningful or realistic opportunity to obtain release with absolutely no mandates in place that require the PPB to consider any factor of rehabilitation and maturity. In *Stevens v. State*, 2018 OK CR 11, ¶ 2, 422 P.3d 741, J; Hudson brought attention to the legislative branch in his opinion specially concurring and writing "[w]e can only hope at this point that any Legislative

action in this area will provide additional explanation beyond that set forth in the current instructions." To date, there has been no legislation that has changed any consideration factors or established a procedural due process to allow for a meaningful procedure and realistic opportunity to those offenders. Law makers continue to voice their unconstitutional concerns in juvenile law and demonstrating unreasonable and arbitrary actions.  Plaintiffs construe the State's failure to act and implement legislation that is constitutional requires intervention by this Court to ensure that the compliance with *Graham* and *Miller* occur. Even under the current legislative session the law will remain unconstitutional. To date, no law has been enacted.

>    **D.    THE TENTH CIRCUIT:**
>       ***Budder v. Addison*, 851 F.3d 1047 (10th Cir. 2017),**
>       ***cert. denied*, *Byrd v. Budder*, ___ U.S.___, (Nov. 27, 2017)**

30.    In *Budder, supra*, the Tenth Circuit held, also on AEDPA review, that a sentence of 155 years for parole consideration violated the Eighth Amendment under *Graham. Id.* at 1053 n.4 ("*Graham* addressed *any* sentence that would deny a juvenile nonhomicide offender a realistic opportunity to obtain release, regardless of the label a state places on that sentence."). It reasoned that *Graham* created a categorical rule, which a state cannot escape "merely because [it] does not label this punishment as 'life without parole.'" *Id.* at 1056. Budder's original sentences of life without parole was modified by the OCCA where the Court simply removed life without parole, imposing life imprisonment and ordering those sentences to run consecutive. Budder received a life

18

sentence with the possibility of parole. The class argues in this case that even Budder's

life sentences offends the constitution for a non-homicide offense.

> ***Establishing a Term Certain for Release on Parole Would
> Effectuate the Eighth Amendment's Ban on Cruel and Unusual
> Punishment So that a Sentence Does Not Exceed a Juvenile
> Offender's Life Expectancy.***

31.     Addressing a juvenile offender's life expectancy provides an informed

estimate that allows sentencing courts to calculate the time he must complete to reenter

society with a meaningful opportunity for release. Society accepts the age of retirement as

a transitional life stage where an individual permanently leaves the work force after having

contributed to society during his or her working life[2]. It is indisputable that retirement is

widely acknowledged as an earned inflection point in one's life, marking the simultaneous

end of a career that contributed to society in some capacity and the birth of an opportunity

for the retiree to attend to other endeavors in life. The Eighth Amendment's requirement

of meaningful opportunity for release for a juvenile offender should presumptively be

mandated before the age of retirement. *Cf. Graham* at 58. To determine whether a

punishment is cruel and unusual, courts must look beyond historical conceptions to the

***evolving standards*** of ***decency*** that mark the progress of a maturing society. *Estelle v.

Gamble*, 429 U.S. 97, 102 (1976)).

32.     A sentence that preserves the juvenile offender's opportunity to contribute

---

[2] See, Retirement, *Black's Law Dictionary* (10th ed. 2014) "Termination of one's own
employment or career, esp. upon reaching a certain age . . . .".

productively to society inherently provides him or her with "hope" to "reconcil[e] with society" and achieve "fulfillment outside prison walls." *Graham* at 79. It also accounts for the Court's trepidation that LWOP sentences deprive non-incorrigible juvenile offenders of vocational training opportunities, which presumably otherwise prepare them to become productive members of society. *Graham* at 74.

33.     The age of 65 appears to be the commonly accepted age of retirement in the national conscience. It was set as the original normal retirement age when the Social Security Act was enacted in 1935, and remains one of the most, if not the most, frequent ages of retirement. See Social Security Act of 1935, Pub. L. No. 74-271, § 210(c), 49 Stat. 620 (defining "qualified individual" for Social Security in part as "any individual with respect to whom . . . is at least sixty-five years of age"); *Id.* § 202(a) (authorizing "qualified individual[s]" to receive Social Security payments "on the date [they] attain[] the age of sixty-five"). Today, pension plans must distribute benefits by age 65 to qualify for various significant tax benefits, see 26 U.S.C. § 401(a)(14)(A), and the Employment Retirement Security Act defines the term "normal retirement age" in part as "the time a plan participant attains age 65," 29 U.S.C. § 1002(24); see also 26 U.S.C. § 411(a)(8)(B)(i) (same); 26 C.F.R. § 1.411(a) -7(b)(ii)(A) (same).

### *Class Action suit in the Western District of Missouri Challenging the Missouri Pardon and Parole Board. Brown, et al. v. Precythe, Case No. 2:17-cv-04082-NKL, (W.D. MO)*

34.     In *Brown, et al. v. Precythe*, the Plaintiffs filed a §1983 action against the PPB that alleged "the Board, which has sole authority to grant or deny parole applications,

is "a political body long criticized for its arbitrariness, dysfunction, and lack of transparency." In Oklahoma, there is one additional actor in the clemency process — *the Governor* — that often manifests as an arbitrary actor according to the statistics of the PPB. The Plaintiffs in *Brown* argue that "the Board also presides over too many hearings to fairly consider the plaintiffs' applications." The PPB has "historically enjoyed broad discretion in its decision making" and decisions purportedly rendered by the full board are not reviewable. *Id*. This also reigns true in Oklahoma, the PPB is exempt from Article II provisions of the Oklahoma Administrative Procedures Act ("APA") as it need not explain its denial. However, now that a liberty interests arises, the Court in *Brown, supra*, concluded that under *Graham*, *Miller*, and *Montgomery*, the juvenile offender has a liberty interest in a meaningful parole review. The State of Oklahoma's parole process is inadequate to fulfill the requirements — which require more than a discretionary parole process — leaving the juvenile offender doomed with a sentence that exceeds their life expectancy. A natural life sentence in Oklahoma is a ***de facto*** LWOP. The statistics of the PPB provide an irrebuttable presumption that Petitioner has a ***de facto*** LWOP sentence.

35.    The OCCA has repeatedly rejected the argument about the PPB not providing a meaningful and realistic opportunity to obtain parole, finding that the argument is outside the purview of post-conviction procedures. However, because a federally established right to a parole system has been established for a juvenile offender there is standing to bring a claim against the PPB for the arbitrariness in a discretionary parole system inadequate to meet the mandates from the Supreme Court regarding the ***meaningful*** and ***realistic***

opportunity. A realistic opportunity means — *it is more likely achievable* — and more than only a remote possibility.

36.     On October 12, 2018, the Federal Court in *Brown* granted the parties' motions for summary judgment, in part and DENIED in part. The Court found "the evidence establishes that certain Defendants' policies, procedures, and customs for parole review for those serving JLWOP sentences violate the class members' constitutional rights."  The LWOP also extends to the de facto LWOP. The Court further stated: ("[T]he court denies without prejudice Hayden's request for the injunctive relief and gives the parties 60 days to present a plan for the means and *mechanism for compliance with the mandates* of *Graham* to provide a *meaningful opportunity* to obtain release based on demonstrated maturity and rehabilitation to juvenile offenders convicted as adults. The plan should include revised policies, procedures, and customs designed to ensure that all Class members are provided a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation."). Can Oklahoma dispute the statistics of the PPB that demonstrate the PPB's procedures are inadequate to provide for a realistic opportunity?

> ***Graham and Miller, Does Not Support a Term-of-Years Sentence that Exceeds the Juvenile Offender's Life Expectancy Because Miller's Eighth Amendment Concerns are for a Meaningful Consideration and Realistic Opportunity for Release.***

37.     Multiple Federal Court decisions have concluded that *Graham*, *Miller*, and *Montgomery* require a meaningful opportunity for a juvenile offender's release upon

demonstration of maturity and rehabilitation. See *Greiman v. Hodges*, 79 F. Supp. 3d 933, 943-44 (S.D. Iowa 2015) (denying motion to dismiss claim that parole review procedures were not compliant with Graham where plaintiff alleged that the parole board "failed to take account of Plaintiff's youth and demonstrated maturity and rehabilitation" and relied solely on "seriousness of the offense" in denying parole) (quotation marks and citation omitted).

38.     *Maryland Restorative Justice Initiative v. Hogan*, supra, (denying motion to dismiss because plaintiffs sufficiently alleged that Maryland's parole system provided only "remote," rather than "meaningful" and "realistic," opportunities for release, including by "den[ying] parole due to the nature of their offenses or their status as lifers"); *Hayden v. Keller*, 134 F. Supp. 3d 1000, 1009 (E.D. N.C. 2015) (denying defendants' motion for summary judgment and granting plaintiff's motion for summary judgment in part after finding that the North Carolina parole system failed to provide a meaningful opportunity for parole because the commissioners and case analysts did not "distinguish parole reviews for juvenile offenders from adult offenders, and thus fail[ed] to consider 'children's diminished culpability and heightened capacity for change'") (citing *Miller* at 479); *Wershe v. Combs*, No. 12-1375, 2016 WL 1253036, at **3-4 (W.D. Mich. Mar. 31, 2016) (finding the reasoning in *Greiman, Maryland Restorative Justice*, and     "persuasive," and noting that the "Supreme Court's discussion  of a meaningful opportunity to obtain release . . . suggests that the decision imposes some requirements after sentencing as well," but concluding that the evidence indicated that the parole board considered the plaintiff's

23

"maturity and rehabilitation").

39.     While the sovereign rights of the State are dissolved, the best interests of the State would be to define a Life sentence that would not exceed the life expectancy of a juvenile offender. The procedures of the Oklahoma Pardon and Parole Board remain inadequate to comply with the mandates from the Supreme Court. The federal courts have determined that a liberty interest exists in parole for those offenders that committed an offense as a juvenile. A natural life which exceeds Plaintiffs life expectancy does not support the position of rehabilitation thus a life sentence violates the Eighth and Fourteenth Amendments.

40.     Due process "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The function of legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions. Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to minimize the risk of error. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

## II.     OKLAHOMA'S TRUTH AND SENTENCING ACT ("ACT") AND SENTENCING MATRIX WERE *REVIVED* AND *REENACTED* BY REFERENCE IN 2018 DEFINING A LIFE SENTENCE AS A TERM OF 18 TO 60 YEARS.

41.     Plaintiffs argue their life sentences for both homicide and non-homicide

offenses have become certain by legislative definition. Plaintiffs state that the legislature has defined a life sentence as a term of years between 18 and 60. Plaintiffs rely on a statement in the 1997 Oklahoma's Truth and Sentencing Act ("Act") and sentencing matrix that is specific to sentences for first degree murder relying on the Act's "general definition" of a life sentence defining it as a term of 18 to 60 years. Plaintiffs' claims are based upon the legislative action utilizing the matrixes under 57 O.S. 2018[3] § 332.7 which refers to persons eligible for consideration for Parole. The language used in this subsection is clear and unmistakable which provides:

A.      For a crime committed prior to July 1, 1998, any person in the custody of the Department of Corrections shall be eligible for consideration for parole at the earliest of the following dates:

1.      Has completed serving one-third (1/3) of the sentence;

2.      Has reached at least sixty (60) years of age and also has served at least fifty percent (50%) of the time of imprisonment that would have been imposed for that offense pursuant to the applicable matrix, provided in Sections 598 through 601, Chapter 133, O.S.L. 1997; provided, however, no inmate serving a sentence for crimes listed in Schedules A, S-1, S-2 or S-3 of Section 6, Chapter 133, O.S.L. 1997, or serving a sentence of life imprisonment without parole shall be eligible to be considered for parole pursuant to this paragraph;

3.      Has reached eighty-five percent (85%) of the midpoint of the time of imprisonment that would have been imposed for an offense that is listed in Schedule A, B, C, D, D-1, S-1, S-2 or S-3 of Section 6, Chapter 133, O.S.L. 1997, pursuant to the applicable matrix; provided, however, no inmate serving a sentence of life

---

[3] Amended by Laws 2018, HB 2286, c. 117, § 2, eff. November 1, 2018.

imprisonment without parole shall be eligible to be considered for parole pursuant to this paragraph; or

4.    Has reached seventy-five percent (75%) of the midpoint of the time of imprisonment that would have been imposed for an offense that is listed in any other schedule, pursuant to the applicable matrix; provided, however, no inmate serving a sentence of life imprisonment without parole shall be eligible to be considered for parole pursuant to this paragraph.

42.    Plaintiffs state because the effective date of the new statute in 2018, Oklahoma's Truth and Sentencing Act became effective and must be applied to them. Plaintiffs argue those sentenced before the enactment of the 85% rule in 2001 may receive credit for time served and earned credits. Plaintiffs argue that the legislative action upon which their claims are based occurred November 1, 2018, establishing the factual predicate of the Class's claims. Plaintiffs' claims are actionable under 42 U.S.C. § 1983 because the actions of the Government were solely arbitrary relating to an Act that never went into effect, nonetheless the Act has been revived by reference to that provision.

43.    However, the Court has supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367. This statute generally confers supplemental jurisdiction over "all other claims" in the same case or controversy as a federal question, without reference to the nature of review. *Chicago v. International College of Surgeons*, 522 U.S. 156 (1997). The Plaintiffs' liberty interest in parole has created a federal constitutional claim because of the State's refusal to comply with the mandates from *Graham* and *Miller*. Plaintiffs argue that after establishing federal jurisdiction the inquiry respecting the state claims are

that they fall within a district court's supplemental jurisdiction, not necessarily its original jurisdiction. Plaintiffs emphasize the congressional intent of supplemental jurisdiction is to allow the district courts to exercise jurisdiction over claims as to which original jurisdiction is lacking.

44.     The Oklahoma Truth in Sentencing Act initially was scheduled to become effective on July 1, 1998. See 1997 Okla. Sess. Laws, 1st Reg. Sess., ch. 133 § 612 (eff. July 1, 1998). The law, however, then was amended to take effect on July 1, 1999 which extended the effective date of the law by one year. One day before the statute was to take effect, the state legislature repealed it, *eff.* on July 1, 1999. This is approximately a week after the June 24, 1999, agreement reached in *Battle v. Saffle,* (Case No. CIV-72-95-B) that the parties agreed to honor and discussed further *infra*. The fact that the government repealed this legislation showed a bad faith abandonment of the agreement in *Battle v. Saffle*.

45.     Plaintiffs argue the due process clause under the Fourteenth Amendment protects against arbitrary legislative action. see e.g., *Daniels v. Williams,* 474 U.S. 327, 331 (1986) (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised). That arbitrary power came from a repeal of Truth in Sentencing — ***oppressively exercised*** — after an agreement was reached in *Battle*. While due process protection in the substantive sense limits what the government may do in both its legislative *Griswold v. Connecticut*, 381 U.S. 479 (1965), and its executive capacities

*Rochin v. California*, 342 U.S. 165 (1952), criteria to identify what is fatally arbitrary differ depending on whether legislation or a specific act of a governmental officer is at issue.

46.     Due process is procedural and substantive "[w]here a particular Amendment provides an explicit textual source of constitutional protection…... that Amendment…… must be the guide for analyzing these claims." *County of Sacramento v. Lewis*, 523 U.S. 833 (1998) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C. J.)). Substantive due process prevents the government from engaging in conduct that "shocks the conscience," . . . or interferes with rights "implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952) and *Palko v. Connecticut*, 302 U.S. 319, 325-326 (1937)). Again, in *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992), the Court said the substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Id.*

47.     Violating the substantive component of due process provides a cause of action under § 1983 regardless of the availability of a state remedy. *Cf. Parratt v. Taylor*, 451 U.S. 527, 545 (1981); *Roe v. Wade*, 410 U.S. 113 (1973). The Federal Constitution prohibits a State from taking certain actions, while in this case the State elected to implement an Act then repealed the Act before its effective date. A legislative action — totally arbitrary. While the 2018 statute revived the repealed Act, the Act should be implemented in its entirety. A constitutional violation is complete as soon as the prohibited

28

action is taken; the independent federal remedy is then authorized by the language and legislative history of § 1983. Taking a historic account of explanations of due process, it guarded against arbitrary action and to keep the capricious kings from destroying at pleasure, SCOTUS found the concept that the framers intended to be was protection against arbitrary action:

> The principal and true meaning of the phrase has never been more tersely or accurately stated than by Mr. Justice Johnson, in *Bank of Columbia v. Okely*, 4 Wheat. 235-244 [(1819)]: As to the words from Magna Charta [sic], incorporated into the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at last settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice. *Hurtado v. California*, 110 U.S. 516, 527 (1884).

(quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)).

48.     The touchstone of due process is protection of an individual or a class against the arbitrary action of government. In *Wolff v. McDonnell*, 418 U. S. 539, 558 (1974), it was whether the fault lies in a denial of fundamental procedural fairness. *See Fuentes v. Shevin*, 407 U.S. 67, 82 (1972), (the procedural due process guarantee protects against "arbitrary takings"), or in exercising power with no reasonable justification in the service of a legitimate governmental objective. In *Washington v. Glucksberg*, 521 U. S. 702, 720-722 (1997), the Court addressed substantive due process and the method of substantive due process analysis having two primary features:

> First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and

29

tradition,' . . . and 'implicit in the concept of ordered liberty' ….. Second, we have required in substantive due-process cases a 'careful description' of the asserted fundamental liberty interest…. Our Nation's history, legal traditions, and practices thus provide the crucial 'guideposts for responsible decision making,'…… that direct and restrain our exposition of the Due Process Clause…... *Id.*

49.     The common law principles of substantive due process prevent "arbitrary impositions." In *Glucksberg*, the Court rejected "shocks-the-conscience" test, just as it rejected the less subjective "arbitrary action" test. A 1992 executive-action case, *Collins v. City of Harker Heights*, 503 U.S. 115 (1992), which had paid lip service to "shocks-the-conscience," see *Id.* at 128, was cited in *Glucksberg* for the proposition that "[o]ur Nation's history, legal traditions, and practices . . . provide the crucial 'guide posts for responsible decision making." *Glucksberg* at 721, quoting *Collins*, *supra*, at 125. Even before *Glucksberg,* the Court characterized the last "shocks-the-conscience" claim to come before us as "nothing more than [a] bald assertio[n]," and had rejected it on the objective ground that the petitioner "failed to proffer any historical, textual, or controlling precedential support for [his alleged due process right], and we decline to fashion a new due process right out of thin air." *Carlisle v. United States*, 517 U.S. 416, 429 (1996). To avoid repetition the issues with the arbitrary action and substantive due process carries over into the next federal constitutional issue.

## III.     ADDITIONAL EIGHT AND FOURTEENTH AMENDMENT VIOLATIONS.

a.   **PRISON OVER CROWDING, INADEQUATE STAFFING THAT CANNOT BE CHARACTERIZED AS A CONDITION OF CONFINEMENT BUT A SYSTEMIC FAILURE ON THE PART OF THE STATE.**

50.     This proposition follows the substantive due process claim compounding the substantive due process violations. The Plaintiffs support their positions with historical, textual, and precedent beginning in 1972, when Bobby Battle filed a pro se Complaint under 42 U.S.C. § 1983, alleging that conditions in the Oklahoma State Penitentiary (OSP) at McAlester, Oklahoma, violated the Constitution of the United States. Counsel was appointed by the Court and the United States entered the case as Plaintiff-Intervenor. The Court found violations of the First, Eight, and Fourteenth Amendments to the Constitution and entered-specific injunctions in the areas of racial segregation, due process, conditions of confinement, access to courts, use of force, use of chemical agents, religious practice and correspondence rights. *Battle v. Anderson*, 376 F. Supp. 402 (E.D. Okla. 1974).

51.     The Court declared the case to be a class action and Ordered a remedy for the violations which it had found. Following the entry of that Order, its terms were extended to govern the conditions for all inmates in the custody of the State of Oklahoma. In 1977, Orders were also entered relative to overcrowding which was also found to be unconstitutional. *Battle v. Anderson*, 441 F. Supp. 516 (E.D. Okla. 1977), aff'd 564 F.2d 38,8 (10th Cir. 1978). See also *Battle v. Anderson*, 451 F. Supp. 719 (E.D. Okla. 1978), modified 594 F.2d 786 (10th Cir. 1979). In June 1999, 26 years after the action was filed,

the parties reached an agreement and a final Order of Dismissal was issued in *Battle v. Saffle*.

52.    In 1999, when the terms of the dismissal were issued by the Court in *Battles,* the parties agreed to expressly defend the Agreement. The Oklahoma Department of Corrections has failed to demonstrate compliance with the U.S. Constitution in areas of that Agreement. This cannot be construed as good faith by the government in abandoning the terms of that Agreement after a dismissal. The Government was provided real notice that a systemic failure plagued the ODOC. The facts demonstrate the terms have been violated. Their cannot be any failure of exhaustion because the Agreement would dissolve any party exhaustion requirements by a class action for the substantive due process violations under the Agreement.

53.    The litigation in *Battle* brought four areas of reform in the Oklahoma prison system. Passing time with the ODOC brought change in the operations of the Oklahoma prison system. In 2016 the Bureau of Justice Statistics (BJS) released an annual inmate census report detailing federal/state inmate populations and incarceration rates. The report shows Oklahoma was second in the nation in overall incarceration rates for 2016 — with 673 people incarcerated per 100,000 residents. Defendant Allbaugh[4], ODOC Director, was quoted stating "Unfortunately, none of this is a surprise," "In fact, we expect Oklahoma's

---

[4] http://doc.ok.gov/oklahoma-no-2-in-the-nation-in-incarceration-in-2016 The Court shall take judicial notice under Fed. R. Evid. 201 of the ODOC website that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

incarceration rate to eventually be the country's highest. This is due to the limited results of criminal justice reform in our state – and Louisiana's successful reform efforts that will reduce how many people that state sends to prison." The Crime and Justice Institute indicates ODOC's inmate population will grow 25% by 2026. In 2015, Oklahoma had 27,650 total offenders with 24,799 male offenders and 2,851 female offenders. In 2014, there was 28,547 total offenders with 25,489 male offenders and 3,058 female offenders demonstrating an increase of 3.2% total offenders with a 2.8% increase in male offender population and 7.3% in female offender population. From 2014-2015, the number of offenders increased by 3,748.

54.     In 2018, Allbaugh's prediction reigned true with the ODOC reaching an all-time high for incarceration. For 2018, Oklahoma's incarceration rate was 1,079 per 100,000 people which placed Oklahoma in the number one position in the World. The study also says Oklahoma incarcerates people at rates higher than all countries with a population of at least 500,000. In June of 2018, PPB member, Kris Steele, told the associated press he expects the State's reform efforts to slow the incarceration rate, not reduce it.[5] Steele's prediction was not correct about slowing incarceration from the alarming numbers and growth within the ODOC.

_____

[5] https://www.usnews.com/news/best-states/oklahoma/articles/2018-06-08/report-oklahoma-tops-states-in-incarceration-rate. The Court shall take judicial notice under Fed. R. Evid. 201.

55.     ODOC requested $1.53 billion in funding from the legislature for Fiscal Year 2019 — more than a $1 billion dollar increase over its appropriation of $485 million. Besides more money for medical treatment, programs and IT needs, ODOC's request included more than $813 million for two new medium-security prisons, $107 million in repairs to crumbling facilities, and $10 million in across-the-board raises. For 2018, the Agency's budget for the fiscal year was $1.6 billion dollars.

56.     In 1978, when the Court reviewed the operations of ODOC, the entire prison population was 4,250. The ODOC has continued to grow where in 1999 there was approximately 20,000 inmates in custody. In 1978, the ODOC operated 6 prisons, in 1999, it operated 17 prisons, and rented space in 5 private prisons. In 1978, 13% of the population was held in community treatment centers; today only 8% of the population is in community treatment centers or work centers. In 1978, the budget for the Department of Corrections was $25.7 million; today the budget is approximate $1.6 billion dollars or an increase of $494.3 million dollars. The conditions of the ODOC buildings are in disrepair according to Defendant Allbaugh.  This is another violation of the Agreement reached in *Battles,* not adequately accommodating the operation of the agency.

57.     Today, the ODOC operates 18 State facilities classified as maximum, medium and minimum-security facilities. The State of Oklahoma has 3 private facilities under contract and one private facility being operated by the state.  There are 6 community corrections centers in operation. The facilities are:

| Region I | Region II | Region III |
| --- | --- | --- |

- Dick Conner CC
- Dr. Eddie Warrior CC
- Howard McLeod CC
- Jackie Brannon CC
- Jess Dunn CC
- Jim E. Hamilton CC
- Mack Alford CC
- Northeast Oklahoma CC
- Oklahoma State Penitentiary

- Charles E. "Bill" Johnson CC
- James Crabtree CC
- John H. Lilley CC
- Joseph Harp CC
- Kate Barnard CC
- LARC
- Mabel Bassett CC
- North Fork CC
- William S. Key CC

- Clara Waters CCC
- Enid CCC
- Lawton CCC
- Oklahoma City CCC
- Oklahoma State Reformatory
- Union City CCC

**Private Facilities**

| Cimarron CF[6] | Davis CF | Lawton CF |
|---|---|---|
| Raymond Byrd, Warden | James Yates, Warden | R.C. Smith, Warden |
| Initial Contract Date May 22, 1997 | Initial Contract Date April 4, 1996 | Initial Contract Date April 22, 1998 |

**Halfway Houses**

- Bridgeway, Inc.
- Carver Transitional Center
- Catalyst Behavioral Services - Enid
- OKC Transitional Center

- OK Halfway House
- Tulsa Transitional Center
- Turley Residential Center

58.     The Plaintiffs argue that because of overcrowding, the Class has been

subjected to a deliberate indifference creating a substantive due process violation and

---

[6] The facility has had several violent incidents over the past several years, including a unit-wide riot in 2013 and at least two riots in 2015. In 2016, a video surfaced of another prisoner fight at the facility. The cell phone video, obtained by KWTV, shows a prisoner being picked up by other inmates and thrown from the second floor of the facility.

subjecting Class members to unnecessary violence that plagues ODOC. Due process does not require a prisoner seeking "a remedy for unsafe conditions [to] await a tragic event [such as an] actual assault before obtaining relief." *Helling v. McKinney*, 509 U.S. 25, 33, 34-35 (1993). However, with the known issues in DOC its indisputable that Plaintiffs' shows that the risk of which he complains is not one that today's society tolerates. Establishing Eighth and Fourteenth Amendment violations above with the PPB's lack of providing a meaningful and realistic opportunity for release are just those claims that society chooses not to tolerate. To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must be "sure or very likely to cause serious illness and needless suffering," and cause "sufficiently imminent dangers." *Helling v. McKinney*, *supra*.

59.    In February 2015, the Associated Press (AP)[7] issued a report indicating Oklahoma has the highest rate of prison homicides in the nation. The figures reviewed by the AP as part of months long investigation show 39 homicides at Oklahoma prisons between 2001 and 2012, a rate of 14 per 100,000 inmates. The second highest rate is Maryland with 11 homicides per 100,000. The national average is 4 per 100,000. Oklahoma prison officials explained 38 killings inside Oklahoma prisons from 2005 to 2014, and a review show 10 of the inmate victims were convicted of sex crimes. The study also showed

---

[7] https://www.tulsaworld.com/news/state/oklahoma-s-prison-inmate-homicide-rate-leads-nation/article_3b992c13-940e-5d54-b816-99f5fde6b34c.html The Court shall take judicial notice under Fed. R. Evid. 201.

Oklahoma had an accidental death rate of 8 per 100,000 inmates, nearly triple the national average.

60.     ODOC spokeswoman Terri Watkins said she couldn't confirm Oklahoma's homicide rate compared to other states, but acknowledged that the number of killings is too high. "There's absolutely no question it's a bad number, and it's absolutely an issue that we're looking at and one that no one wants to have, but it exists in the prison system," said Watkins. "We're doing everything in our power ... but bad things happen when you're dealing with bad people." Watkins declined to speculate on why Oklahoma's rate is so high, but those who work inside Oklahoma's prisons say the reason is simple: "The facilities are *overcrowded and understaffed*." No exhaustion of remedies would lie against the Agency for these violations of the Federal Constitution because exhaustion has proved futile under *Battle* and the State's arbitrary refusal to honor that Agreement.

61.     Figures from the U.S. Bureau of Justice Statistics show Oklahoma had the highest rate of inmate homicides during a period from 2005 to 2012. The incidents for the years 2001-2015 are described by ODOC:

- 2005: 5 homicides, one each at Lawton CF, Cimarron CF, Oklahoma State Penitentiary, and Oklahoma State Reformatory.

- 2006: 4 homicides; two at Dick Conner CC, and one each at Oklahoma State Reformatory and Lawton CF.

- 2007: 6 homicides; two at Oklahoma State Penitentiary, and one each at

- 2010: no homicides.

- 2011: 1 homicide at Oklahoma State Reformatory.

- 2012: 5 homicides; two at Lawton CF, and one each at Lexington Assessment and Reception Center, Oklahoma State Reformatory, and one at Mack Alford CC.

Davis CF, Oklahoma State Reformatory, Dick Conner CC, and Lawton CF.

- 2008: 6 homicides; four at Oklahoma State Reformatory, and one each at Oklahoma State Penitentiary and Dick Conner CC.

- 2009: 6 homicides; all at the Oklahoma State Penitentiary.

- 2013: 2 homicides; one at Lawton CF and one at Oklahoma State Penitentiary.

- 2014: 3 homicides; one at James Crabtree CC and two at Davis CF.

- 2015: 4 Oklahoma inmates were slain during a two-minute-long fight at the Cimarron CF.

62.     With the 2014 homicide at James Crabtree, Warden Janet Dowling said she had 60 correctional officers to oversee 1,010 inmates. Those officers work 12-hour shifts and 20 hours of mandatory overtime each week. She said she had 28 open positions at the facility and 61 support staff. "I can tell you my staffing level on the best days is 15 on the day shift and 12 on the night shift to watch 1,010 inmates," she said. "Recruitment and retention are a very large challenge for us, especially at the Department of Corrections[8]."

63.     On June 6, 2000, Joe Gamble, 29, a prison guard at the OSR in Granite, Oklahoma, died from stab wounds inflicted by an inmate. Gamble saw another guard, Callaway, being attacked by the inmate and intervened. Callaway, 35, was stabbed 13 times by the inmate. The issues with corrections are not that security concerns are limited to the offender population but extend to officer safety.

---

[8] https://www.enidnews.com/news/local_news/daughter-inmate-had-more-than-wounds/article_524c934d-fe00-5b4c-8125-ecbff732ed5d.html The Court shall take judicial notice under Fed. R. Evid. 201.

64.    In September of 2015, 4 Oklahoma inmates were slain and 4 others injured during a two-minute-long fight at the Cimarron Correctional Facility in Cushing. This was the deadliest incident in the history of ODOC.

65.    On September 12, 2018, ODOC officials released information regarding two deaths[9] at OSP. Officials stated the two deaths were not related. On January 12, 2019, ODOC released information it is investigating an inmate homicide at OSP, in McAlester. Department Officials say it took place Friday night. A correctional officer doing a routine security check around 7:30 p.m. found a maximum-security inmate, Anthony Joseph Palma,[10] unresponsive inside his cell.

66.    On May 9, 2017, the ODOC was made aware of a video posted online[11] that was recorded inside the Lexington Assessment and Reception Center (LARC) in 2016 appearing to be a collection from several days. Defendant Allbaugh said: "This type of behavior and expression of opinion is unacceptable and will not be tolerated." The comments subject to the video were:

> "There ain't no pass... we are kinda going to backdoor some s*** today," a corrections officer stated in a daily briefing.

> "I ain't got nothing other than we are short as f***... so, get down on them units and get the s*** out the windows, get these motherf***ers up and get them clean," a corrections officer stated in a daily briefing.

---

[9] Stanley Majors, 63, and Bobby Bailey, 57.

[10] Palma was convicted at trial in Oklahoma County District Court in 2017 for a cold case murder. He was sentenced to life in prison without the possibility of parole. He did not appeal.

[11] http://www.news9.com/story/35388616/doc-investigating-disturbing-video-from-state-prison. The Court shall take judicial notice under Fed. R. Evid. 201.

"Hey, before everybody leaves, we need to be doing our security checks. That guy had been dead for a minute., an officer said, "that motherf***er was already stiff or getting stiff."

"There's only like 40 child molesters in there... just lock the Godd*** doors and f*** them, let them die," an officer said. "But don't let them be dead more than 30 minutes or we are going to be in f***ing trouble."

67.     The Plaintiffs argue that while this incident was captured on video at one facility, this is a commonplace occurrence within the ODOC. A spokesman with ODOC, Mark Myers, in an unrelated incident stated[12] "unless criminal charges are filed, it's unlikely the investigation will be made public. Oklahoma's Open Records Act exempts law enforcement investigatory files from public release, even after an investigation has been closed."

68.     The ODOC has the lowest paid correctional officers in the United States while the corrections staff is responsible for the world's largest offender population. This important fact is crucial to understanding that employees are incentivized at introducing contraband into the facilities. On January 3, 2019, food service supervisor Adam Siemer was going through the employee security check point at the Oklahoma State Penitentiary when a correctional officer told him to remove his prosthetic leg for searching. At the bottom of the prosthetic, staff reportedly found two bags of methamphetamine. Siemer was arrested by McAlester police and was suspended by ODOC.

---

[12] https://www.readfrontier.org/stories/correctional-officer-injuries-at-cushing-prison-latest-in-string-of-violent-incidents-at-the-facility/. The Court shall take judicial notice under Fed. R. Evid. 201.

69.     The Court has explained that to prevail on such a claim there must be a "substantial risk of serious harm," an "objectively intolerable risk of harm" that prevents prison officials from pleading they were "subjectively blameless for purposes of the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 842, 846, and n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). See *Savage v. Fallin*, No. 16-6083. (10ᵗʰ Cir. 2016), the Court held:

> We reach the opposite conclusion as to Warden Bryant and DOC Director Patton. Savage cited statements made by Patton noting that prison understaffing has created dangerous situations in Oklahoma. He also claims that Patton personally made the decision to transfer inmates from county jails to DOC custody, causing overcrowding at JCCC. As to Bryant, Savage alleges that he has failed to appropriately discipline inmates and cites to public statements from the previous JCCC warden decrying understaffing at the facility. See *Farmer*, 511 U.S. at 842 (subjective element may be satisfied by showing that problems were "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past"). Given that deliberate indifference may be demonstrated through "circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," Id. We conclude Savage has satisfied his initial pleading burden as to the subjective prong.

70.     "No static test can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). The Constitution "does not mandate comfortable prisons," *Rhodes* at 349, but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling* at 31.

41

71.     The Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates," *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984). See *Helling v. McKinney*, 509 U.S. 25, 33, 34-35 (1993); *Washington v. Harper*, 494 U.S. 210, 225 (1990); *Estelle*, 429 U.S., at 103. Cf. *DeShaney v.Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 198-199 (1989).

72.     No doubt overcrowd increases the incidents of both infectious communicable diseases (e. g., flu, hepatitis, tuberculosis, etc.,) and stress related diseases (e. g., rashes, asthma, hypertension, etc.). It is a harsh thing to say that the lives and health of inmates must be sacrificed to the administrative convenience of the defendants. *Battle v. Anderson*, 564 F. 2d 388, 398 (10th Cir. 1977). In *Battle* at 401, the Court held that the Trial Court's finding that the overcrowding inmate population at the two subject Oklahoma institutions constitutes cruel and unusual punishment proscribed under the Eighth Amendment to the United States Constitution, is supported by substantial evidence. See *Estelle v. Gamble*, 429 U.S. 97 (1976)

73.     In July 1973, OSP at McAlester erupted into one of the worst prison riots in U.S. history[13]. Crowded conditions that led to the riot had been in place almost since the

---

[13] Bibliography
  • Daily Oklahoman (Oklahoma City), 1 August 1973.
  • Clyta Foster Harris, "A History of the Oklahoma Prison System, 1967–1983" (Ph.D. diss., University of Oklahoma, 1985).

facility's construction in 1911. Housing capacity for 1100 inmates was surpassed in 1920, and by 1973, the prison population exceeded 2200. Gov. David Hall's refusal to sign parole recommendations for drug offenders and individuals convicted of violent crimes had contributed to prison overcrowding. The numbers with today's PPB also indicate the same arbitrary decisions contributing to the mass numbers of offenders in Oklahoma. Also, poorly trained staff and inadequate correctional officers and other factors also led to prisoners' discontent in 1973.

74.     Around 2:30 p.m., inmates in the mess hall stabbed Capt. C.C. Smith and Lt. Thomas Payne. Prison official Jack Hall and Deputy Warden Sam Johnston both attempted to help but were attacked by 11 or 12 inmates and taken as the first hostages. Approximately 21 prison officials were held hostage. At 4:30 p.m. the first of three inmate deaths occurred when Elwoodrow Lee Brooks was stabbed and beaten to death by fellow prisoners. By 5:35 p.m. the inmates had seized the hospital; 25 minutes later the prison was ablaze. Among the demands the inmates made for the release of hostages were total amnesty for the ringleaders of the riot, media coverage, and access to U.S. Justice Department and American Civil Liberties Union attorneys. On July 28 at 12:30 p.m. inmates released the hostages but retained control of the prison until August 4. The riot

---

- McAlester (Oklahoma) News-Capital, 5 August 1973.
- McAlester Prison Riot, Vertical File, Research Division, Oklahoma Historical Society, Oklahoma City.
- Harijit S. Sandhu, "History of Corrections in Oklahoma, 1908–1988" (Stillwater: Oklahoma State University, 1991).
- Tulsa (Oklahoma) Tribune, 16 March 1974.

caused more than $20 million in damage to twenty-four buildings, and the state considered closing the prison. A Special Task Force Committee on Penal Institutions convened from August 7 to September 21, 1973, to determine the fate of the McAlester prison and the penal system in Oklahoma. The committee determined that the Oklahoma State Prison should function only as a maximum-security prison for three hundred to five hundred prisoners and that personnel quality should be improved by in-service training and higher salaries. Today salaries are the lowest in the United States for Oklahoma prison workers.

75.     Unfortunately, these provisions were never implemented and thus did little to solve the problems. In March 1974, Bobby Battle, won a lawsuit against Warden Park J. Anderson and the ODOC for alleged cruelty and discrimination. United States District Court Judge Luther Bohanon ruled for Battle and handed down a written opinion listing 43 orders to corrections officials about minimum standards for the prisoners' medical care, housing, and safety.

76.     Despite changes in prison conditions, another riot occurred at OSP on December 17, 1985, when a group of inmates stabbed three guards, one seriously and took seven other officers' hostage. After a 17-hour standoff, the hostages were released. About 80 inmates caused $376,000 damage. On August 29, 1983, inmates took temporary control of Dick Conner Correctional Center near Hominy. One inmate died and 19 inmates and three guards were hospitalized. During the siege, fires were set in several housing units and a library. With repairs costing $1.8 million. In May 1988, eight correctional officers were held captive during a three-day riot at Mack Alford Correctional Center in Stringtown. The

44

guards were released unharmed, but two housing units were burned, causing an estimated $7 million in damage. The history with the ODOC with overcrowding cannot be exhausted as exhaustion is futile.

## IV.    EXHAUSTION OF REMEDIES.

77.    The exhaustion doctrine is inapplicable to the Plaintiff's claims in their entirety because neither Defendant has "no power to decree ……. relief." *Reiter v. Cooper*, 507 U.S. 258, 269 (1993). Plaintiff's need not exhaust administrative remedies where doing so would otherwise be futile or inadequate. See *Smith v. Robinson*, 468 U.S. 992, 1014, n.17 (1984) (citing cases); see also 121 Cong. Rec. 37416 (1975) (remarks of Sen. Williams) ("[E]xhaustion . . . should not be required . . . in cases where such exhaustion would be futile either as a legal or practical matter"). As a legal matter any issue raised is a non grievable issue under ODOC's officials.


## RELIEF SOUGHT

1.    Declaratory Judgment that the current parole process afforded to those convicted as juveniles serving de facto LWOP sentences are unconstitutional.
2.    An injunction requiring Defendants to provide proceedings that afford a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation for youthful offenders serving unconstitutional de facto LWOP sentences.
3.    Plaintiffs seek declaratory judgement because the Oklahoma legislature's utilizing Oklahoma's Truth and Sentencing Act ("Act") and sentencing matrix.
4.    Plaintiffs seek all costs associated with this action
5.    Plaintiffs seek reasonable attorney fees.

Respectfully Submitted,

/s/ RONALD "SKIP" KELLY
RONALD "SKIP" KELLY, OBA # 4937
Two Broadway Executive Park
205 NW 63rd, Suite 150
Oklahoma City, OK 73116
(405) 235-1976
(405) 286-6316 (fax)
kellyron01@yahoo.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on this 2nd day of April, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System.

/s/ RONALD "SKIP" KELLY
RONALD "SKIP" KELLY

46